# United States Court of Appeals for the Federal Circuit

2005-1330, -1582

DIPPIN' DOTS, INC. and CURT D. JONES,

Plaintiffs-Appellants,

v.

THOMAS R. MOSEY, DOTS OF FUN,
INTERNATIONAL LASER EXPRESSIONS, INC. (also known as I.L.E., Inc.),

Defendants-Cross Appellants,

and

NICHOLAS ANGUS,

Defendant/Counterclaimant-Cross
Appellant,

and

FROSTY BITES DISTRIBUTION LLC,

Defendant-Appellee,

and

FROSTY BITES DISTRIBUTOR OF FLORIDA, INC.,
FROSTY BITES DISTRIBUTOR OF GEORGIA, INC.,
FROSTY BITES OF MICHIGAN, INC.,
J&J CONCESSIONS OF NEW JERSEY, INC.,
FROSTY BITES ICE CREAM COMPANY, LLC,
FROSTY BITES SOUTH, INC.,
INTERNATIONAL ASSOCIATION OF AMUSEMENT PARKS
AND ATTRACTIONS, FROSTY BITES OF NEW YORK, LLC,
and FROSTY BITES ICE CREAM DEVELOPMENT, LLC,

Defendants,

v.

F. ROBERT ESTY, JR., BARRY JAY BASS,
VICTOR BAUER, JACK MILLER, DANIEL KILCOYNE,
SHAWN P. KILCOYNE, and DANIEL DOPKO,

Counterclaim Defendants,

and

FROSTY BITES, INC.
(now known as Mini Melts, Inc.),

Counterclaim Defendant-Cross
Appellant.

Daniel J. Warren, Sutherland Asbill & Brennan LLP, of Atlanta, Georgia, argued for plaintiffs-appellants, Dippin Dots, Inc. and Curtis D. Jones. With him on the brief were Candice C. Decaire, Erin C. Witkow, and Troy R. Covington. Of counsel was Todd Stockwell, Stockwell & Associates, of Lexington, Kentucky.

Robert G. Oake, Jr., Oake Law Office, of Allen, Texas, and Rudolf O. Siegesmund, Siegesmund & Associates, of Dallas, Texas, argued for defendants-cross-appellants Thomas R. Mosey et al., defendant/counterclaimant-cross appellant Nicholas Angus, and counterclaim defendant-cross appellant, Frosty Bites, Inc. (now known as Mini Melts, Inc.).

Keith E. Broyles, Alston & Bird LLP, of Atlanta, Georgia, argued for defendant-appellee. With him on the brief were Stacey A. Mollohan and William R. Hubbard.

Appealed from: United States District Court for the Northern District of Texas

Judge Thomas W. Thrash, Jr.

# United States Court of Appeals for the Federal Circuit

2005-1330, -1582

DIPPIN' DOTS, INC. and CURT D. JONES,

Plaintiffs-Appellants,

v.

THOMAS R. MOSEY, DOTS OF FUN,
INTERNATIONAL LASER EXPRESSIONS, INC. (also known as I.L.E., Inc.),

Defendants-Cross Appellants,

and

NICHOLAS ANGUS,

Defendant/Counterclaimant-Cross
Appellant,

and

FROSTY BITES DISTRIBUTION LLC,

Defendant-Appellee,

and

FROSTY BITES DISTRIBUTOR OF FLORIDA, INC.,
FROSTY BITES DISTRIBUTOR OF GEORGIA, INC.,
FROSTY BITES OF MICHIGAN, INC.,
J&J CONCESSIONS OF NEW JERSEY, INC.,
FROSTY BITES ICE CREAM COMPANY, LLC,
FROSTY BITES SOUTH, INC.,
INTERNATIONAL ASSOCIATION OF AMUSEMENT PARKS
AND ATTRACTIONS, FROSTY BITES OF NEW YORK, LLC,
and FROSTY BITES ICE CREAM DEVELOPMENT, LLC,

Defendants,

v.

F. ROBERT ESTY, JR., BARRY JAY BASS,
VICTOR BAUER, JACK MILLER, DANIEL KILCOYNE,
SHAWN P. KILCOYNE, and DANIEL DOPKO,

Counterclaim Defendants,

and

FROSTY BITES, INC.
(now known as Mini Melts, Inc.),

Counterclaim Defendant-Cross Appellant.

_____

DECIDED:  February 9, 2007

_____


Before MAYER, RADER, and GAJARSA, <u>Circuit Judges</u>.

GAJARSA, <u>Circuit Judge</u>.

This is a patent infringement and antitrust case dealing with a unique ice cream product.  Plaintiffs Dippin' Dots, Inc. and Curt D. Jones (collectively "DDI") appeal from the district court's claim construction and summary judgment of noninfringement of U.S. Patent No. 5,126,156 ("the '156 patent") and from the judgment following jury trial that all claims of that patent are obvious, that the patent is unenforceable due to inequitable conduct during prosecution, and that DDI violated the antitrust laws by asserting a patent that had been procured through fraud on the Patent Office.  We affirm the judgments of noninfringement, obviousness, and unenforceability, but reverse as to the antitrust counterclaim.

2005-1330, -1582                                    2

# I.    BACKGROUND

## A.    The Technology and Patent

The '156 patent, covering subject matter invented by plaintiff Jones and exclusively licensed to plaintiff Dippin' Dots, is directed to a process for making a form of cryogenically prepared novelty ice cream product.  Claim 1, the only independent claim, reads:

> A method of preparing and storing a free-flowing, frozen alimentary dairy product, comprising the steps of:
> [(1)] preparing an alimentary composition for freezing;
> [(2)] dripping said alimentary composition into a freezing chamber;
> [(3)] freezing said dripping alimentary composition into beads;
> [(4)] storing said beads at a temperature at least as low as -20° F. so as to maintain said beads free-flowing for an extended period of time;
> [(5)] bringing said beads to a temperature between substantially -10° F. and -20° F. prior to serving; and
> [(6)] serving said beads for consumption at a temperature between substantially -10° F. and -20° F. so that said beads are free flowing when served.

'156 patent col.6 ll.41-57 (numbering added for reference).  DDI has commercialized this process.  The ice cream it produces, sold under the Dippin' Dots brand, is known to patrons of amusement parks, stadiums, shopping malls, and the like.

The initial application that eventually issued as the '156 patent, filed on March 6, 1989, omitted the final "serving" step from Claim 1.  The examiner rejected all of the claims as obvious in light of Canadian Patent No. 964,921, of Aref et al.  DDI appealed the rejections to the Board of Patent Appeals and Interferences ("Board"), which affirmed the rejection.  DDI then filed a continuation application, amending Claim 1 by adding the "serving" step.  The examiner again rejected over the Aref reference, noting that "dependent on the food product being served," it would be obvious to serve the product in a cold, free-flowing state.  DDI then submitted a declaration pursuant to 37

C.F.R. § 1.132 in which it submitted evidence of the significant commercial success of its method. It argued that its commercial success should weigh against a finding of obviousness. See Graham v. John Deere Co., 383 U.S. 1, 17-18 (1966) (noting that commercial success is one of the "secondary considerations" that may serve as "indicia of . . . nonobviousness"). The examiner agreed and the '156 patent issued in June 1992.

B.     The Festival Market Sales

Much of the debate in this case centers on the import of sales made at the Festival Market mall in Lexington, Kentucky, more than a year before DDI filed its patent application. Sales made more than one year before the patent's priority date implicate the on-sale bar of 35 U.S.C. § 102(b). For the '156 patent, this critical date is March 6, 1988. Starting on July 24, 1987, Jones sold cryogenically-prepared, largely beaded ice cream at the Festival Market. During Jones's time at Festival Market, which lasted at least until July 29th, over 800 customers purchased his beaded ice cream and others received free samples. The customers were permitted to leave with the product and were not restricted by any kind of confidentiality agreement. Jones later testified that his main goal at the Festival Market was to "get . . . test-marketing information" and not to further develop technical aspects of his product such as particular temperature ranges for storage and service.

It is undisputed that the Festival Market sales were never disclosed to the Patent and Trademark Office ("PTO") during prosecution of the '156 patent. The declaration of commercial success which ultimately persuaded the examiner to grant the patent

contained a sworn statement by Jones that "[t]he initial sales were in March of 1988," which was on or after the critical date.

Jones testified that at Festival Market he only practiced the first three steps of the claimed method, not the storing, bringing, or serving steps. He testified that he considered the evidence of what had happened at Festival Market to be irrelevant to patentability. The attorney who prosecuted the '156 patent, Warren Schickli, testified that he considered the sales to have been experimental since the process as practiced at Festival Market could not be feasibly commercially exploited. He also testified that the Festival Market ice cream was not sold for "direct consumption" under the meaning of Claim 1, because the ice cream was too cold to eat comfortably when initially given to the consumer.

## C.     Prior Litigation

The controversy in this case began when several of DDI's distributors severed their relationship, found alternative manufacturing sources, and entered into competition against DDI. DDI initiated a series of patent infringement lawsuits against its new competitors in various judicial districts. In this appeal, the defendants fall into two primary categories: the "manufacturing parties" who make the competing ice cream product and the "distributing parties" who sell it to consumers.[1] The defendants counterclaimed for violation of § 2 of the Sherman Act due to DDI's allegation of patent infringement based on a fraudulently acquired patent. This type of antitrust claim has

---

[1] The manufacturing parties are Defendants Thomas Mosey, Dots of Fun, International Laser Expressions, Inc., Nicholas Angus, and Frosty Bites, Inc. (now known as Mini Melts, Inc.). Defendant Frosty Bites Distribution, its various local affiliates, and individuals such as founder Victor Bauer are the distributing parties. The issues in this case are not generally resolved in a manner unique to particular defendants, so we refer collectively to "the defendants" where appropriate.

become known as a "Walker Process" claim, named for the Supreme Court's decision in Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 177 (1965). The various suits were consolidated by the Judicial Panel on Multi-District Litigation for pretrial proceedings before the United States District Court for the Northern District of Georgia, with Judge Thomas W. Thrash presiding. That court adopted in large part an earlier-recommended claim construction by a special master. In re Dippin' Dots Patent Litig., 249 F. Supp. 2d 1346, 1366 (N.D. Ga. 2003). It issued summary judgment of noninfringement both literally, id. at 1368, and via the doctrine of equivalents, id. at 1370-71. It refused to grant summary judgment to any party on invalidity, id. at 1362, 1364, or on inequitable conduct, id. at 1365.[2]

After the pretrial proceedings in the Northern District of Georgia were completed, the case was remanded to the United States District Court for the Northern District of Texas. Judge Thrash, sitting by designation, continued to preside over the Northern District of Texas proceedings. That court conducted a jury trial on the issues of invalidity, unenforceability, and antitrust violations by DDI. By special verdict, the jury found that the sales by Jones prior to March 1988 could be asserted against the patent as prior art and that all claims of the '156 patent were invalid as obvious. The jury also found that both Jones and Schickli had, with intent to deceive, made material misrepresentations or omissions in violation of the duty of candor to the PTO. It also determined that defendants Mini Melts, Inc. and Frosty Bites Distribution had proven all

_____

[2] The district court also granted summary judgment in favor of the defendants as to claims of trade dress infringement, id. at 1374-75, and trade secret violations, id. at 1376. It granted summary judgment to the plaintiffs on a minor contract issue. Id. at 1378. These issues are not before us on appeal. The trade dress issue was appealed separately to the Eleventh Circuit, which affirmed. Dippin' Dots, Inc. v. Frosty Bites Distrib., 369 F.3d 1197 (11th Cir. 2004).

required elements of their antitrust counterclaim, including the requisite fraud on the PTO. However, it found no antitrust damages, granting the counterclaim plaintiffs zero dollars in damages on their Sherman Act counterclaim. The district court denied DDI's motion for judgment notwithstanding the verdict (JMOL), finding that there was sufficient evidence for the jury to find all claims obvious and that DDI had withheld a material reference with the deceptive intent required for <u>Walker Process</u> liability. The district court then weighed that same evidence of intent and materiality itself and found the patent unenforceable due to inequitable conduct before the PTO. In its final judgment dated February 28, 2005, it awarded attorney fees under the Clayton Act to defendant Frosty Bites Distribution ("FBD") in the amount of $676,675.46.

The defendants appealed to this court on March 25, 2005. After the notice of appeal was filed, the district court made two additional rulings. On August 4, 2005, it granted defendant Mosey's motion for attorney fees under the Clayton Act, which had been outstanding at the time of the final judgment. On August 18, 2005, FBD moved for an amendment of the attorney fee order to add fees under 35 U.S.C. § 285, the patent statute's fee-shifting provision. We deactivated the appeal while that motion was pending. On October 13, 2005, the district court granted FBD's motion and awarded it an additional $504,158.16 in fees under § 285. On November 18, 2005, this court reactivated the appeal and set a briefing schedule. DDI's opening brief included challenges to the August 4 and October 13 fee awards. A motions panel of this court ruled that, since DDI had failed to amend its March 25 notice of appeal to include references to the later district court orders, we lacked jurisdiction to hear DDI's challenge to those later orders. <u>Dippin' Dots v. Mosey</u>, No. 05-1330, slip op. at 3 (Fed.

Cir. May 1, 2006). DDI was directed to file a replacement brief omitting the arguments held to be jurisdictionally barred. Id., slip op. at 4.

In its amended brief, DDI appeals the claim construction and summary judgment of noninfringement, the refusal to overturn the jury verdict of obviousness and liability under the antitrust laws, the finding of inequitable conduct, and the award of attorneys' fees under the Clayton Act granted to FBD. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

## II.    DISCUSSION

A.    Claim Construction and Infringement

DDI challenges the summary judgment of noninfringement on the grounds that the district court[3] construed the claims of the '156 patent erroneously. Its primary arguments relate to the appropriate reach of the term "beads" in Claim 1, which the district court construed to mean "small frozen droplets . . . which have a smooth, spherical (round or ball shaped) appearance." The district court's construction also excluded processes which produce any "irregular or odd shaped particles such as 'popcorn.'" The district court correctly found that the claim steps mentioning "beads" were limited to covering processes that produce beads and only beads. The accused process produces both spheres and irregular particles, so under this construction, the defendants do not infringe. DDI objects both to the definition of "beads" and to the district court's refusal to use the word "comprising" to extend the coverage of the claim beyond a beads-only process. As to the definition of "beads," the district court correctly

---

[3]    As described supra, the claim construction and summary judgment phases of this litigation were handled by the United States District Court for the Northern District of Georgia. "The district court" as used in this section refers to that court.

noted that the written description specifically describes "beads" as having a "smooth, spherical appearance." '156 patent col.5 ll.22-23. Indeed, DDI argued to the Special Master before whom the construction issue was originally presented that a "bead" was "a small round ball or round drop." There is no error in the district court's definition of this term.

As to DDI's second argument, we acknowledge that the term "comprising" raises a presumption that the list of elements is nonexclusive. See Genentech, Inc. v. Chiron Corp., 112 F.3d 495, 501 (Fed. Cir. 1997). However, "'[c]omprising' is not a weasel word with which to abrogate claim limitations." Spectrum Int'l, Inc. v. Sterilite Corp., 164 F.3d 1372, 1380 (Fed. Cir. 1998). "Comprising" appears at the beginning of the claim—"comprising the steps of"—and indicates here that an infringing process could practice other steps in addition to the ones mentioned. Those six enumerated steps must, however, all be practiced as recited in the claim for a process to infringe. The presumption raised by the term "comprising" does not reach into each of the six steps to render every word and phrase therein open-ended—especially where, as here, the patentee has narrowly defined the claim term it now seeks to have broadened. The district court's limitation of the claim scope to exclude processes that produce some irregularly shaped particles is correct.

DDI also objects to the district court's definition of "free flowing," but the court did not rely on that definition to support its summary judgment ruling. Dippin' Dots, 249 F. Supp. 2d at 1367 ("Since Defendants' process produces beads and irregularly shaped particles of ice cream, Defendants' method does not literally infringe the '156 patent."). Since that basis of the district court's decision was based on a properly construed claim

term, we affirm the summary judgment of no literal infringement. DDI does not appeal the summary judgment of noninfringement under the doctrine of equivalents, so the court need not consider the doctrine of equivalents.

B.    Obviousness

The case was transferred to the Northern District of Texas and tried to a jury, which found all claims of the '156 patent to be obvious. When reviewing a district court's JMOL determination as to obviousness, "[t]his court reviews a jury's conclusions on obviousness, a question of law, without deference, and the underlying findings of fact, whether explicit or implicit within the verdict, for substantial evidence." LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc., 275 F.3d 1347, 1353 (Fed. Cir. 2001). Those factual underpinnings include the scope and content of the prior art, differences between the prior art and the claims at issue, and the level of ordinary skill in the art. Graham, 383 U.S. at 17. Our precedent requires that the party urging obviousness demonstrate a teaching, suggestion, or motivation to combine references. C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d 1340, 1351 (Fed. Cir. 1998). This test is a flexible one which may find motivation to combine in the knowledge of one skilled in the art or in the nature of the problem to be solved. Alza Corp. v. Mylan Labs., Inc., 464 F.3d 1286, 1291 (Fed. Cir. 2006). Secondary indicia of nonobviousness, such as commercial success, long-felt need, or failure of others are also relevant. Graham, 383 U.S. at 17-18.

To find obviousness in light of the Festival Market sales requires two conclusions: first, those sales must have been in the prior art; second, the process practiced at Festival Market combined with any other relevant prior art must render the

claims of the '156 patent obvious. Substantial evidence existed for the jury to find the facts necessary to support both conclusions.

The first question is whether the sales at Festival Market constitute prior art that can be asserted against the '156 patent claims in an obviousness analysis. It is undisputed that those sales occurred before the patent's critical date of March 6, 1988. Sales made before the critical date would render invalid any claims that they anticipate, but the defendants do not allege here that the Festival Market sales embodied every element of any claim of the '156 patent. Instead, they argue that the claims are obvious in view of the Festival Market sales combined with the prior art cited by the examiner during prosecution. Those sales may indeed be considered when determining whether the claims are invalid for obviousness. The public sale of goods produced by a process more than one year before a patent is filed places that process in the § 102(b) prior art. See Invitrogen Corp. v. Biocrest Mfg., 424 F.3d 1374, 1382 (Fed. Cir. 2005) (citing Metallizing Eng'g Co. v. Kenyon Bearing & Auto Parts Co., 153 F.2d 516, 520 (2d Cir. 1946) (Learned Hand, J.)). Prior art under the § 102(b) on-sale bar is also prior art for the purposes of obviousness under § 103. See LaBounty Mfg. v. Int'l Trade Comm'n, 958 F.2d 1066, 1071 (Fed. Cir. 1992) ("Section 102(b) may create a bar to patentability . . . in conjunction with [§ 103], if the claimed invention would have been obvious from the on-sale device in conjunction with the prior art."). DDI argues that the sales at Festival Market were experimental in nature and therefore avoid the on-sale bar. In light of Jones's testimony that his purpose was to determine the marketability of his ice cream product and not to improve it technically, the jury could have found facts supporting a conclusion that the sales were not experimental. See In re Smith, 714

F.2d 1127, 1135 (Fed. Cir. 1983) ("The experimental use exception . . . does not include market testing where the inventor is attempting to gauge consumer demand for his claimed invention."); see also Paragon Podiatry Lab., Inc. v. KLM Labs. Inc., 984 F.2d 1182, 1193 (Fed. Cir. 1993). The Festival Market sales are therefore prior art citable against the patent claims for obviousness purposes.

The second question is whether the Festival Market sales, considered as prior art to the '156 patent, render its claims invalid for obviousness. We conclude that they do. The first three steps of the patented process (preparing, dripping, and freezing) were concededly practiced at Festival Market. The last two—bringing to a higher temperature and then serving at that temperature for direct consumption—were at least very closely approximated. No evidence of the exact temperature of any product served at Festival Market has been presented, but it would have been obvious in light of the activity there to measure that temperature and serve the product within an easily determined range of palatability. The fourth step, "storing" at a very cold temperature for an extended period of time, may not have been present, but extended cold storage was an obvious elaboration on the Festival Market sales in order to distribute and retail the product. The motivation for DDI to make these trivial modifications is readily apparent from the problem to be solved. Someone of ordinary skill in the art of ice cream retailing, seeking to commercially develop the inventive kernel found at Festival Market, would immediately seek the appropriate temperature ranges within which to store and serve the product. See Alza, 464 F.3d at 1291 (noting that teaching, motivation, or suggestion can come from nature of problem to be solved).

The jury could reasonably have found that the secondary factor of commercial success advanced by Jones to obtain the '156 patent was obviated by the Festival Market sales. If the factors that led to DDI's later commercial success were largely present at Festival Market, later changes to the process encompassed by the '156 patent could reasonably be seen as not improving the prior art's commercial appeal much, if at all. See J.T. Eaton & Co. v. Atlantic Paste & Glue Co., 106 F.3d 1563, 1571 (Fed. Cir. 1997) ("the asserted commercial success of the product must be due to the merits of the claimed invention beyond what was readily available in the prior art.").

The factual underpinnings implicit in the jury's verdict are supported by substantial evidence, and based on those facts, we affirm the judgment of obviousness.

C.    Inequitable Conduct

We have stated that "[a] patent may be rendered unenforceable for inequitable conduct if an applicant, with intent to mislead or deceive the examiner, fails to disclose material information or submits materially false information to the PTO during prosecution." Digital Control Inc. v. The Charles Mach. Works, 437 F.3d 1309, 1313 (Fed. Cir. 2006). The party urging unenforceability must show by clear and convincing evidence that the applicant met "thresholds of both materiality and intent." Molins PLC v. Textron, 48 F.3d 1172, 1178 (Fed. Cir. 1995). Where, as here, those factual findings were made by the district court, we review them for clear error. Id. The ultimate determination of inequitable conduct is committed to the sound discretion of the trial court. We review for abuse of that discretion. Union Pac. Res. Co. v. Chesapeake Energy Corp., 236 F.3d 684, 693-94 (Fed. Cir. 2001).

The first prong of the inequitable conduct test, materiality, is clearly met here. As discussed supra, the Festival Market sales render the '156 patent invalid for obviousness. Had those sales been disclosed to the PTO, the patent may or may not have issued. At the very least, the existence of such sales prior to the critical date is a matter that "a reasonable examiner would have considered . . . important in deciding whether to allow the . . . application." Dayco Prods., Inc. v. Total Containment, Inc., 329 F.3d 1358, 1363 (Fed. Cir. 2003); see also Digital Control, 437 F.3d at 1316 (holding that "reasonable examiner" standard remains sufficient ground for inequitable conduct materiality even after 1992 amendment of 37 C.F.R. § 1.56).

The question of deceptive intent is a more difficult one, but we find no clear error in the district court's determination on this point. "'Smoking gun' evidence is not required in order to establish an intent to deceive . . . . Rather, this element of inequitable conduct[] must generally be inferred from the facts and circumstances surrounding the applicant's overall conduct." Paragon Podiatry Lab., Inc. v. KLM Labs. Inc., 984 F.2d 1182, 1189 (Fed. Cir. 1993). We have noted that omission of sales made before the critical date is especially problematic:

> Absent explanation, the evidence of a knowing failure to disclose sales that bear all the earmarks of commercialization reasonably supports an inference that the inventor's attorney intended to mislead the PTO. The concealment of sales information can be particularly egregious because, unlike the applicant's failure to disclose, for example, a material patent reference, the examiner has no way of securing the information on his own.

Id. at 1193. While DDI wholly neglected to disclose the Festival Market sales to the PTO, it enthusiastically touted sales made after the critical date as evidence of the commercial appeal of its process. That combination of action and omission permits an inference of the minimum, threshold level of intent required for inequitable conduct. The

evidence to support a finding of intent may not be particularly strong here (a point we discuss further in Part II.D, infra.) However, the district court was permitted to balance the relatively weak evidence of intent together with the strong evidence that DDI's omission was highly material to the issuance of the '156 patent and to find that on balance, inequitable conduct had occurred.[4] Such a finding, as an exercise of the district court's equitable powers, is within its discretion. See Molins, 48 F.3d at 1178 ("Once threshold findings of materiality and intent are established, the court must weigh them to determine whether the equities warrant a conclusion that inequitable conduct occurred."). We perceive no abuse of discretion here. The district court's inequitable conduct finding is correct.

D.    Walker Process Antitrust Claim

The defendants in this case counterclaimed against DDI for violation of § 2 of the Sherman Act, and the same jury that found the patent obvious found DDI liable on that counterclaim. Proof that a patentee has "obtained the patent by knowingly and willfully misrepresenting facts to the Patent Office . . . [is] sufficient to strip [the patentee] of its exemption from the antitrust laws." Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 177 (1965). A party who asserts such a fraudulently obtained patent may be subject to an antitrust claim. If a patentee asserts a patent claim and the defendant can demonstrate the required fraud on the PTO, as well as show that "the other elements necessary to a § 2 case are present," the defendant-counterclaimant is entitled to treble damages under the antitrust laws. Id. at 175.

---

[4]      The district court characterized DDI's intent to deceive as "of a high nature." We disagree, but believe that in light of the high materiality of the nondisclosure, inequitable conduct can still be found here even though the evidence reveals less than an egregriously willful intent to deceive.

The first barrier for a <u>Walker Process</u> claimant to clear is the requirement that the patent be obtained through actual fraud upon the PTO. This question is governed by Federal Circuit law. <u>Nobelpharma AB v. Implant Innovations, Inc.</u>, 141 F.3d 1059, 1068 (Fed. Cir. 1998) (<u>en banc</u> in relevant part). A finding of inequitable conduct does not by itself suffice to support a finding of <u>Walker Process</u> fraud, because "inequitable conduct is a broader, more inclusive concept than the common law fraud needed to support a <u>Walker Process</u> counterclaim." <u>Nobelpharma</u>, 141 F.3d at 1069. To demonstrate <u>Walker Process</u> fraud, a claimant must make higher threshold showings of both materiality and intent than are required to show inequitable conduct. <u>Id.</u> at 1070-71; <u>C.R. Bard, Inc. v. M3 Sys., Inc.</u>, 157 F.3d 1340, 1364 (Fed. Cir. 1998) (<u>Walker Process</u> claimant "must make a greater showing of scienter and materiality than when seeking unenforceability based on conduct before the Patent Office"). Furthermore, a finding of <u>Walker Process</u> fraud cannot result from an equitable balancing between the two factors; a strong showing of one cannot make up for a deficiency in the other. <u>Nobelpharma</u>, 141 F.3d at 1071. The difference in breadth between inequitable conduct and <u>Walker Process</u> fraud admits the possibility of a close case whose facts reach the level of inequitable conduct, but not of fraud before the PTO. This is such a case.

The heightened standard of materiality in a <u>Walker Process</u> case requires that the patent would not have issued but for the patent examiner's justifiable reliance on the patentee's misrepresentation or omission. <u>C.R. Bard</u>, 157 F.3d at 1364. The defendants have established materiality even under this strict threshold, since the evidence supports a finding that the patent would not have issued if DDI had disclosed

the Festival Market sales to the PTO. The difficulty comes in establishing that the omission of those sales was done with fraudulent intent. DDI did make certain statements to the PTO that would have been more completely accurate had it included information about the Festival Market sales. For instance, it suggested that its method was "the first method to allow serving of a completely free flowing frozen alimentary dairy product for direct consumption by consumers." That statement would have been more helpful to the PTO if it had also disclosed that the first free-flowing sales had arguably happened at Festival Market, but the statement was not actually false. Likewise, DDI argued against obviousness by pointing out that none of the cited references taught free-flowing service. Again, this statement would have better informed the PTO if it had clarified that elsewhere in the prior art, such service arguably existed, but again, the statement was true. The problem was not with its falsity but with its incompleteness.

Ultimately, the defendants' fraud case here is built only upon DDI's omission of the Festival Market sales from the prosecution record. While Walker Process intent may be inferred from the facts and circumstances of a case, "[a] mere failure to cite a reference to the PTO will not suffice." Nobelpharma, 141 F.3d at 1071. This is not to say that an omission always reduces to "mere failure to cite." We acknowledged in Nobelpharma "that omissions, as well as misrepresentations, may in limited circumstances support a finding of Walker Process fraud . . . because a fraudulent omission can be just as reprehensible as a fraudulent misrepresentation." 141 F.3d at 1070. We believe, though, that to find a prosecution omission fraudulent there must be evidence of intent separable from the simple fact of the omission. A false or clearly

misleading prosecution statement may permit an inference that the statement was made with deceptive intent. For instance, evidence may establish that a patent applicant knew one fact and presented another, thus allowing the factfinder to conclude that the applicant intended by the misrepresentation to deceive the examiner. That is not the case with an omission, which could happen for any number of nonfraudulent reasons—the applicant could have had a good-faith belief that disclosure was not necessary, or simply have forgotten to make the required disclosure. In this case, DDI argues that it did not disclose the Festival Market sales to the PTO because it believed that the product there was made without practicing the "storing," "bringing," or "serving" steps of the claim within the specified temperature ranges, and that therefore the Festival Market sales were merely cumulative to other prior art references which also lacked those three steps. The jury was of course allowed to disbelieve or discount evidence tending to support this claim. However, the defendants submitted no evidence of their own—aside from the absence of the Festival Market sales from the prosecution record—which affirmatively shows DDI's fraudulent intent. That intent cannot be shown merely from the absence of evidence which would come about from the jury's discounting DDI's explanation.

Nobelpharma serves as a good example of the sort of facts that do prove Walker Process fraud by omission. In that case, the inventors had transmitted to their Swedish patent agent a draft patent application which included a citation to a book written by the patentee in 1977. 141 F.3d at 1062. That book was eventually held to anticipate the patent. Id. at 1072. The agent "deleted all reference to the 1977 Book from the patent application that was ultimately filed in Sweden" and then also failed to mention the book

in the U.S. application that led to the patent at issue.  <u>Id.</u> at 1062.  When pressed on the issue at trial, the agent "could not explain, even in retrospect, why he deleted all reference to the 1977 Book."  <u>Id.</u> at 1072.  We found that the evidence of actual deletion by the patent agent gave the jury reasonable ground to find intent to defraud by the patentees.  <u>Id.</u>

There is no similarly strong evidence that the omission in this case was fraudulent.  It might be argued that because the omitted reference was so important to patentability, DDI must have known of its importance and must have made a conscious decision not to disclose it.  That argument has some force, but to take it too far would be to allow the high materiality of the omission to be balanced against a lesser showing of deceptive intent by the patentee.  Weighing intent and materiality together is appropriate when assessing whether the patentee's prosecution conduct was inequitable.  <u>Molins</u>, 48 F.3d at 1178.  However, when <u>Walker Process</u> claimants wield that conduct as a "sword" to obtain antitrust damages rather than as a mere "shield" against enforcement of the patent, <u>Nobelpharma</u>, 141 F.3d at 1070, they must prove deceptive intent independently.  The defendants have not done so here to the extent necessary for a reasonable jury to find <u>Walker Process</u> fraud.  The finding of fraud on the PTO is therefore reversed.

DDI also argues that the antitrust judgment must be reversed because the jury was not presented with sufficient evidence of the definition of the relevant market.  Fraudulent acquisition of the asserted patent strips the <u>Walker Process</u> defendant[5] of its antitrust immunity, but that is the beginning, not the end, of the inquiry.  The

___

[5]    Here that defendant is the plaintiff DDI, which is defending against a <u>Walker Process</u> counterclaim.

counterclaimant must also show the basic elements of an antitrust violation defined by the regional circuit's law, including that the patentee's behavior was directed to a relevant product market. Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc., 375 F.3d 1341, 1363 (Fed. Cir. 2004), rev'd on other grounds, 126 S. Ct. 980 (2006).[6] In this case, DDI's antitrust immunity remains intact due to insufficient evidence of fraud. We therefore reach neither DDI's argument on this point nor the defendants' argument that DDI waived the market definition issue by failing to raise it below.

E.    Attorney Fees

With the judgment of antitrust liability reversed, the grant of attorney's fees under § 4 of the Clayton Act must be vacated. As mentioned supra, a motions panel of this court has found that we lack jurisdiction to hear DDI's challenge of that fee grant as to defendant Mosey. Dippin' Dots v. Mosey, No. 05-1330, slip op. at 3 (Fed. Cir. May 1, 2006). However, our vacatur of fees is entirely derivative of our ruling on the merits, not based on an acceptance of DDI's jurisdictionally barred direct challenge to the fee award. The vacatur therefore extends to all defendants, including Mosey.[7]

DDI argued as a separate ground for reversal of the attorney fee award that a jury verdict indicating zero dollars in antitrust damages cannot support a Clayton Act fee award. Since the judgment of liability is reversed, we do not reach this argument.

---

[6]    Unitherm applied Tenth Circuit antitrust law. Id. (citing United States v. AMR Corp., 335 F.3d 1109, 1113 (10th Cir. 2003); Telecor Commc'ns v. Sw. Bell Tel. Co., 305 F.3d 1124, 1130-31 (10th Cir. 2002)). Fifth Circuit law also requires proof of a relevant market. Doctor's Hosp. v. Se. Med. Alliance, 123 F.3d 301, 311 (5th Cir. 1997).
[7]    Defendants move to strike the portions of DDI's amended brief which argue that the fee awards should be vacated if DDI prevails on the merits. Br. of Mosey et al. at 1; Br. of Frosty Bites Distribution LLC at 1. Their objections are denied.

The district court indicated that if it were to reduce its Clayton Act fee grant, it would increase the fees under the Patent Act to compensate. With the Clayton Act fee grant vacated, the district court may review the award of fees under the patent statute. On remand, the district court may determine whether and to what extent fees under 35 U.S.C. § 285 are appropriate.

### III. CONCLUSION

We affirm the findings of noninfringement, obviousness, and unenforceability due to inequitable conduct. We reverse the district court's denial of JMOL as to the antitrust counterclaim, vacate the grants of attorneys' fees under the Clayton Act, and remand for the district court to consider whether an additional fee award under the patent statute is available.

AFFIRMED-IN-PART, REVERSED-IN-PART, VACATED-IN-PART, AND REMANDED

No costs.