# United States Court of Appeals for the Federal Circuit

---

**ABSOLUTE SOFTWARE, INC. AND ABSOLUTE SOFTWARE CORPORATION,**
*Plaintiffs-Appellants,*

v.

**STEALTH SIGNAL, INC. AND COMPUTER SECURITY PRODUCTS, INC.,**
*Defendants-Cross Appellants.*

---

2010-1503, -1504

---

Appeals from the United States District Court for the Southern District of Texas in case no. 05-CV-1416, Senior Judge Ewing Werlein, Jr.

---

Decided: October 11, 2011

---

IRENE Y. LEE, Russ August & Kabat, of Los Angeles, California, argued for plaintiffs-appellants. With her on the brief was MARC A. FENSTER.

JEREMY L. DOYLE, Reynolds, Frizzell, Black, Doyle, Allen & Oldham LLP, of Houston, Texas, argued for defendants-cross appellants. With him on the brief were J. CHRISTOPHER REYNOLDS and BILLY BERRYHILL.

---

Before RADER, *Chief Judge*, PROST, and O'MALLEY, *Circuit Judges*.

O'MALLEY, *Circuit Judge*.

This is a patent infringement action between companies that sell competing software products designed to track lost or stolen laptop computers, which one company refers to as "LoJack for Laptops." Each side asserted claims of patent infringement against the other based on their respective software products. Following the parties' cross-motions for summary judgment, the district court entered summary judgment of non-infringement for each side. *See Absolute Software, Inc. v. Stealth Signal, Inc.*, 731 F. Supp. 2d 661 (S.D. Tex. 2010) ("*District Court Decision*"). Both sides appeal from this judgment. Specifically, Absolute Software, Inc. and Absolute Software Corporation (collectively, "Absolute") challenge certain of the district court's claim constructions and appeal from the district court's grant of summary judgment of non-infringement in favor of Stealth Signal, Inc. ("Stealth Signal") and Computer Security Products, Inc. ("CSP") (collectively, "Stealth") with respect to U.S. Patent Nos. 6,244,758 ("the '758 Patent"); 6,300,863 ("the '863 Patent"); and 6,507,914 ("the '914 Patent") (collectively, the "Absolute Patents"). Stealth Signal likewise challenges certain of the district court's claim constructions and cross-appeals from the district court's grant of summary judgment of non-infringement in favor of Absolute with respect to U.S. Patent No. 5,406,269 ("the '269 Patent").

For the reasons discussed below, we do not alter any of the claim constructions challenged on appeal. We also find that the district court correctly granted summary judgment of non-infringement to Absolute. We conclude, however, that issues of fact preclude granting summary judgment of non-infringement to Stealth. Accordingly, we

affirm-in-part, vacate-in-part, and remand this matter for further proceedings.

BACKGROUND

A.  The Absolute Patents

The Absolute Patents relate to a method, apparatus, and system for retrieving lost or stolen electronic devices such as laptop computers, personal digital assistants (PDAs), and cell phones, via a global network, such as the Internet.  The patents are respectively entitled "Apparatus and Method for Monitoring Electronic Devices via a Global Network" ('758 Patent); "Method and Apparatus to Monitor and Locate an Electronic Device Using a Secured Intelligent Agent via a Global Network" ('863 Patent); and "Computer Security Monitoring Apparatus and System" ('914 Patent).  Under the '758 Patent, for example, the invention requires a software program (the "agent") that can be loaded onto an electronic device, such as a laptop computer.  Using a global network (e.g., the Internet), the agent software program communicates information about the identity and location of the protected electronic device to a host system, which the host system uses to track the whereabouts of the device.

Each of the asserted claims of the '758 and '863 Patents requires a step of the agent "providing said host system with one or more global network communication links used to enable transmission between said electronic devices and said host system . . . ."  *E.g.*, '758 Patent col.21 ll. 24-27; '863 Patent col.33 ll.22-25.  Representative claim 1 of the '758 Patent recites (in this claim and the others below, the term at issue on appeal is emphasized):

1.  A method for tracing an electronic device having an agent, said agent used for pro-

viding identifying indicia and location information for said electronic device to a host system, said electronic device connectable to said host system through a global network, said method comprising the steps of:

loading said agent within said electronic device for initiating communication with said host system such that said agent evades detection;

automatically providing said host system with said identifying indicia through said global network for determining the identity of said electronic device; and

*providing said host system with one or more of the global network communication links used to enable transmission between said electronic device and said host system*, said communication links used for determining the location of said electronic device.

'758 Patent col.21 ll.12–27. This claim, therefore, requires that the agent (e.g., the software program loaded onto a laptop computer) provide the host system with "one or more global network communication links" that the host system can use to track the location of the protected device. With respect to this limitation, the parties dispute whether a "communication link" can be a single Internet Protocol ("IP") address or whether it must be a *connection* between two IP addresses, which by definition requires at least two IP addresses to identify the connection. As discussed below, the district court construed the term to require at least two IP addresses.

With respect to the final Absolute Patent, the '914 Patent, the only independent claim asserted is claim 4, which recites

4. A computer security monitoring system, comprising:

a computer having visual and audible user interfaces;

a telecommunication interface operatively connected to the computer; and

agent means embedded in the computer for sending signals to the telecommunication interface including signals for *contacting a host monitoring system without signaling the visual or audible user interface*, and for providing the host monitoring system with identification indicia of the computer, whereby the host monitoring system could identify whether the computer has been reported lost based on the identifying indicia.

'914 Patent col.627 ll.18-29. The emphasized term requires that the agent "contact" the host without making a signal that a user can see or hear. According to the Summary of the Invention, this feature allows the agent to "evade detection and resist possible attempts to disable it by an unauthorized user." *Id.* col.2 ll.22-24. In other words, the invention requires that the agent send a signal without alerting an unauthorized user, such as a thief, thus preventing the user from becoming aware of the signal and attempting to obstruct it.

B.   Stealth's '269 Patent

The '269 Patent, which issued to inventor David Baran on April 11, 1995, is entitled "Method and Apparatus for the Remote Verification of the Operation of Electronic Devices by Standard Transmission Mediums."

Stealth obtained a license to this patent in response to Absolute's assertion of patent infringement. The '269 Patent generally describes an invention that remotely monitors electronic devices by imbedding in such devices an agent that makes surreptitious calls to a central monitoring site. The invention has two fundamental purposes: (1) to monitor the performance of an electronic device remotely, and (2) to detect the misuse of software, such as when it is installed on multiple computers without a license.

Four independent claims of the '269 Patent are at issue on appeal: claims 11, 12, 25, and 29. Claims 12 and 25 contain the term "semi-random rate." Representative claim 12 recites:

> 12. A remote site performance monitoring system for inclusion in an electrical apparatus to monitor and collect performance data thereof during operation surreptitiously of a user of said electrical apparatus for transmitting said collected performance data to a central site means for comparing the received collected performance data with expected performance data for electrical apparatus of the type in which said remote site performance monitoring system has been added, said remote site system comprising:
>
> *   *   *   *
>
> transmission means for initiating, at a *semi-random rate*, the transmission of the message packet from the formatting means to the central site means of the system surreptitiously of a user of said electrical apparatus.

'269 Patent col.9 l.59–col.10. l.12 (emphasis added). This claim requires that the system have a transmission

means for sending a message packet to a central site means, and the transmission must occur at a "semi-random rate." The Summary of the Invention of the '269 Patent states that "[t]he call initiation is preferentially triggered at a carefully controlled semi-random rate, perhaps once a week." *Id.* col.2 ll.57-59.

Finally, the last two claims at issue on appeal, claims 11 and 29 of the '269 Patent, contain the terms "unique usage agreement information" and "said terms of said usage agreement imbedded in said software." Claim 11 recites:

> 11. A method for monitoring software usage of owner-leased proprietary software residing in at least one remote computer surreptitiously of a user of said remote computer to detect violations of software usage agreements surreptitiously of a user of said remote computer at a central site means, said method comprising the steps of:
>
> a. imbedding *unique usage agreement information* that is transparent to the user in each original copy of said owner-leased proprietary software;
>
> b. each of said at least one remote computers monitoring the use of said software of step *a.* surreptitiously of a user of said remote computer;
>
> c. each of said at least one remote computers automatically, at various times, reporting *said terms of said usage agreement imbedded in said software* and the use of said software by said remote computer monitored in step b. to said central site means surreptitiously of a user of said remote computer;
>
> \*   \*   \*   \*

'269 Patent col.9 ll.27-58 (emphasis added). This claim requires the remote computer to send certain usage agreement information to a central site, though the parties dispute whether that information can be just the serial number of a license agreement, or whether it must include the actual terms and provisions of the license agreement.

### C. The Parties' Accused Products

Absolute and Stealth sell competing software products for tracking lost or stolen laptop computers. Stealth's product is the XTool Computer Tracker ("XTool" or "XTool Tracker"). There are two important features of the XTool Tracker as it relates to this appeal: (1) the "agent" (i.e., the software program) of the XTool Tracker sends message packets to the host that, when they arrive, contain both the IP address of the client computer and the IP address of the host, and it is undisputed that the agent furnishes at least the IP address of the client computer; and (2) to design around the "contacting . . . without signaling" limitation of Absolute's '914 Patent, Stealth added an audible signal that occurs at the end of every communication between the agent and the host, just before the connection ends.

Absolute's product is called Computrace. Importantly for this appeal, it is undisputed that the Computrace product is designed to initiate a call to the monitoring center 24.5 hours following the completion of its previous call. It is also undisputed that Absolute's Computrace product transmits an electronic serial number relating to a licensing or usage agreement to the host monitoring center but does not transmit the actual terms of the licensing or usage agreement.

### D.  Litigation and Claim Construction

In October 2004, Absolute filed a complaint in the United States District Court for the District of Washington alleging that Stealth infringed the three Absolute Patents identified above, as well as other patents that are not at issue on appeal.  Stealth Signal counterclaimed for infringement of the '269 Patent and for declarations of non-infringement, invalidity, and unenforceability relating to the Absolute Patents.[1]  Stealth successfully moved to transfer the action to the United States District Court for the Southern District of Texas, where the case proceeded to final judgment.

For purposes of claim construction, the district court appointed a special master, Professor David B. Johnson, Associate Professor of Computer Science and of Electrical and Computer Engineering at Rice University, pursuant to Rule 53 of the Federal Rules of Civil Procedure.  The special master conducted hearings on the parties' claim construction arguments and, on February 8, 2008, issued a 130-page Report and Recommendation on Claim Construction ("R&R").

When it appointed the special master, the district court entered an order requiring the parties to file any objections to the special master's recommended claim construction within twenty days of the R&R.[2]  *See Abso-*

---

[1]    Although Stealth Signal, not CSP, owns a license to the '269 patent and asserted the counterclaims in this action, both the district court and the parties refer to Stealth Signal and CSP collectively as the counterclaimant and cross-appellant.  For ease of reference and continuity, we do the same.  Because the district court did not enter any adverse judgment against CSP, however, CSP is not properly a cross-appellant.

[2]    While this order corresponded to the then-governing time frame for the filing of objections under

*lute Software, Inc. v. Stealth Signal, Inc.*, Case No. 05-CV-1416 (S.D. Tex. Apr. 10, 2007) (Order Vacating Hearing and Appointing Special Master, ECF 143). On February 28, 2008, Absolute and Stealth submitted their respective objections to the special master's claim construction. While Stealth objected to several aspects of the special master's report, in its objections, Absolute "commend[ed] the Special Master on an extraordinarily thorough and thoughtful analysis of the claim construction issues," and objected to only two portions of the report, neither of which relate to this appeal: (1) the construction of the term "automatically" from the Absolute Patents; and (2) a "narrow legal issue" relating to the construction of a means-plus-function claim. Joint Appendix ("JA") 040132.

Following the parties' objections, the special master issued an Amendment to the Report and Recommendation on Claim Construction, which amended the claim constructions for three terms, only one of which is at issue on appeal: "semi-random rate." On June 17, 2009, the district court adopted the special master's R&R as modified by the Amendment to the Report. The specific claim constructions relevant to this appeal are discussed where appropriate below.

### E. The District Court's Summary Judgment Decision

The district court allowed each party to file one motion for summary judgment, not to exceed thirty-five pages. Following the parties' cross-motions, the district court granted summary judgment of non-infringement for

---

Rule 53 of the Federal Rules of Civil Procedure, it was entered as a case-management order and did not expressly invoke the time limits in the rule.

both parties on their respective patent infringement claims.

As it relates to Absolute's infringement claims, the district court held that Stealth's XTool Tracker did not meet the "providing said host system with one or more of the global network communication links" limitation of the '758 and '863 Patents, finding that Absolute failed to demonstrate that the XTool agent sends a link (i.e., two IP addresses) to the host. *See District Court Decision*, at 671-72. The district court also held that Stealth did not infringe the '914 Patent, the asserted claims for which contain the "contacting . . . without signaling" limitation, because the XTool Tracker emits an audible signal at the end of every communication with the host. *Id.* at 673.

With respect to Stealth's infringement claim, the district court found that neither the "semi-random rate" limitation nor the "terms of said usage agreement" limitation reads onto Absolute's Computrace software. As for the "semi-random rate" limitation, the court found that Absolute did not literally infringe the '269 Patent because the Computrace product's call-time formula places a call every 24.5 hours after the end of the previous call and, thus, does not meet the randomness requirement. *Id.* at 666-67. It also found that Absolute did not infringe under the doctrine of equivalents because the "semi-random rate" limitation of the '269 Patent and Absolute's call-timing formula perform different functions. *Id.* at 668-69. Finally, the district court found that Absolute did not meet the "terms of said usage agreement" limitation because its software sends only a serial number of a license to a monitoring center, but the claim, as construed, requires the agent to send actual licensing terms. *Id.*

Accordingly, the district court entered summary judgment of non-infringement for both Absolute and Stealth.[3] The parties filed timely notices of appeal. This court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

### STANDARDS OF REVIEW

Applying Fifth Circuit law, we review the district court's decision to grant summary judgment *de novo*, applying the same standard as the district court. *United States v. Caremark, Inc.*, 634 F.3d 808, 814 (5th Cir. 2011). Summary judgment is appropriate if, in viewing the evidence in a light most favorable to the non-moving party, the court finds that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Determining infringement requires two steps. "First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993) (citations omitted). The proper construction of a patent's claims is an issue of Federal Circuit law, and we review a district court's claim construction *de novo*. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454–55 (Fed. Cir. 1998) (en banc). To ascertain the scope and meaning of the asserted claims, we look to the words of the claims themselves, the specification, the prosecution history, and any relevant extrinsic evidence. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315–17 (Fed. Cir. 2005) (en banc).

---

[3] The district court also held that certain claims of Stealth's '269 Patent were invalid under 35 U.S.C. § 112, ¶ 2, for failure to disclose and clearly link any structure to the recited function. Stealth has not appealed that portion of the decision.

Infringement, whether literal or under the doctrine of equivalents, is a question of fact. *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998). On appeal from a grant of summary judgment of non-infringement, we determine whether, after resolving reasonable factual inferences in favor of the patentee, the district court correctly concluded that no reasonable jury could find infringement. *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1429 (Fed. Cir. 2000).

DISCUSSION

A. Absolute's Appeal

Absolute raises three issues on appeal, arguing that: (1) the district court's claim construction of the term "global network communication links" is erroneous;[4] (2) genuine issues of material fact preclude summary judgment of non-infringement of the '758 and '863 Patents; and (3) genuine issues of material fact preclude summary judgment of non-infringement of the '914 Patent. Although we find that Absolute waived its right to challenge the district court's claim construction by failing to file timely objections to the special master's R&R, we agree that summary judgment of non-infringement as to all three Absolute Patents was improper. We address each issue in turn below.

---

[4] The full claim term is "providing said host system with one or more of the global network communication links used to enable transmission between said electronic device and said host system." For ease of reference, we refer to the term as "global network communication links" because those words form the crux of the dispute.

### 1. Construction of "global network communication links"

In his February 8, 2008 report, the special master construed the term "global network communication links" as "the identification of one or more (perhaps less than all) of the connections (either direct or indirect) between two nodes in the Internet (one of the nodes may be the electronic device itself) used to enable data transmission between said electronic device and said host system." JA 040027. The construction therefore defines "communication links" as the connections between two nodes in the Internet rather than as the nodes, or IP addresses of routers, themselves.

On February 28, 2008, Absolute filed timely objections to the special master's report, but it challenged only two portions of the report, neither of which related to the special master's recommended construction of "global network communication links." JA 040132. On the same date, Stealth also filed objections, including to the special master's construction of "global network communication links." Stealth argued that "links" should mean "IP routers," a position consistent with its proposed construction. JA 040132. The special master ultimately amended its construction of three terms but left the construction of "communication links" unchanged. The district court adopted the special master's amended R&R.

On appeal, Stealth argues that Absolute waived its right to challenge the district court's construction of "global network communication links" by failing to object to the special master's recommended construction within the deadline established both by rule and by court order. There is no dispute that Absolute failed to challenge the special master's proposed recommendation within the twenty-day period. Indeed, Absolute's counsel conceded

this fact at oral argument. *See* Oral Arg. at 10:3 –11:15, *available at* http://www.cafc.uscourts.gov/oral-argument-recordings/all/absolute.html ("That's absolutely right, we did not raise that objection within the twenty-day time period, and that was a mistake on our part.")

Despite acknowledging that its objection was untimely, Absolute asserts that we should not find waiver because its argument was "presented to the district court" in the sense that Absolute offered its position prior to the special master's report on claim construction. We do not find Absolute's argument persuasive. A primary purpose of appointing a special master is to narrow the issues before the district court judge to facilitate an efficient and timely resolution of complex or highly-technical issues, such as patent claim construction. *See* Fed. R. Civ. P. 53 adv. comm. notes (2003 amendments) ("The court's responsibility to interpret patent claims, for example, may be greatly assisted by appointing a master who has expert knowledge of the field in which the patent operates"; "the advantages of initial determination by a master may make the process more effective and timely than disposition by the judge acting alone"). Both Rule 53(f)(2) of the Federal Rules of Civil Procedure and the district court's order expressly included a mechanism for parties to file objections and a time limit to do so. It is through these objections that the district court can determine which issues remain in dispute and require the court's attention. Accepting Absolute's argument that its challenge to the special master's claim construction was "presented to the district court" simply because it was argued to the special master would eviscerate the very purpose of this procedure.

Although it is true that Stealth timely objected to the construction of "global network communication links," that is irrelevant because it is Absolute, not Stealth, that

seeks to raise this issue on appeal.[5]  Stealth's objection to the special master's construction differed from that now urged by Absolute.  Indeed, Stealth contended that the proper construction should be "IP router," which is materially different from the "IP address" construction Absolute would have us now employ.  *See* Stealth's Principal and Response Br. 54 ("Stealth certainly did *not* agree that a 'communication link' could be identified using an IP address of any single node, such as the client's computer." (emphasis in original)).  Under these circumstances, we find that Absolute's failure to raise this particular objection, in the face of both Rule 53(f)(2) and a court order setting a specific deadline for the filing of objections, results in waiver of the argument on appeal.  *See Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997) ("[A]ppellate courts do not consider a party's new theories, lodged first on appeal . . . .  In short, this court does not 'review' that which was not presented to the district court."); *see also Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1344 (Fed. Cir. 2001) (citing *Sage* for the same proposition).  We recognize that this court retains discretion to deviate from the

---

[5]  Twenty-six days after the objections were due, Absolute filed a response to Stealth's objections.  While still not asserting a formal objection to the special master's construction of "global network communication links," Absolute urged the court to modify the construction "slightly" to construe "links" to be IP addresses.  We do not find that this belated and imprecise argument preserved Absolute's objection on this issue.  Indeed, Absolute neither cited to nor relied upon this submission in its briefing to this court, asserting instead, and only, that its arguments to the special master were sufficient.  In the face of Absolute's express *endorsement* of the special master's construction of this term, we cannot agree that Absolute timely presented its current arguments on the issue to the district court.

general rule of waiver in certain circumstances. *See Interactive Gift*, 256 F.3d at 1344. We decline to do so here, however, given the careful claim construction procedure the district court established in this case. In addition, we otherwise do not find that any of the reasons we have enumerated in the past for considering an argument that was not presented properly below are present in this case. *See L.E.A. Dynatech, Inc. v. Allina*, 49 F.3d 1527, 1531 (Fed. Cir. 1995) ("An appellate court will consider an issue not presented below only if: (i) the issue involves a pure question of law and refusal to consider it would result in a miscarriage of justice; (ii) the proper resolution is beyond any doubt; (iii) the appellant had no opportunity to raise the objection at the district court level; (iv) the issue presents significant questions of general impact or of great public concern; or (v) the interest of substantial justice is at stake." (internal quotations and brackets omitted)).

### 2.   Summary judgment of non-infringement of the '758 and '863 Patents

Absolute argues that, even if we affirm the district court's construction of "global network communication links," summary judgment of non-infringement is inappropriate because genuine issues of material fact remain as to whether Stealth's XTool Tracker agent furnishes, supplies, or makes available[6] one or more connections between two nodes on the Internet (i.e., two IP addresses) to the host. The district court found that the XTool Tracker agent furnishes only one IP address to the host and, therefore, does not infringe the '758 and '863 Patents

---

[6]   The term "providing," which precedes "one or more global network communication links" in the claim, was construed to mean "the agent furnishing, supplying, or making available." JA 030028. Neither party has challenged this construction on appeal.

as a matter of law. Because we conclude that there are genuine issues of fact as to whether the XTool Tracker agent also provides a second IP address, and therefore a "connection," we conclude that summary judgment of non-infringement on this issue was improper.

Under the district court's claim construction, if the agent provides the IP addresses of both the agent and host, the agent will satisfy this limitation of the asserted '758 and '863 Patent claims. The parties disputed whether the XTool agent provided two IP addresses, and both sides submitted expert declarations on this point. Stealth contended in its briefing that its expert witness, Stealth President Pedro Camargo, stated that "the Stealth agent provides *only* the IP address of the monitored device." Stealth's Principal and Response Br. 15 (emphasis added). This is an overstatement of the expert's declaration. Mr. Camargo makes only a conclusory statement that Stealth does not infringe Absolute's patents, adding that "the Stealth 'agent' provides the IP address of the device; and, an IP address is not a 'link,' or a 'connection'; it is, instead, a 'node.'" Decl. of Pedro Camargo, JA 090010, ¶ 8. He never explicitly states that Stealth's agent does not provide the host IP address, nor does he explain what other component of the electronic device supplies it.

The testimony of Absolute's expert, Gregory Ennis, is also not directly on point. Mr. Ennis only states that the packet generated by the Stealth agent, "when received by the host system, contains both the IP address of the device and the IP address of the Stealth Control Center." Decl. of Gregory B. Ennis, JA 100028, ¶ 18. He never explicitly states that the agent *provides* both the agent IP address and the host IP address. Rather, he finishes his discussion with the conclusory statement that "[t]he agent thereby provides the host system with such a [global

network communication] link." *Id.* In sum, both experts had the opportunity to provide direct evidence regarding how the host IP address comes to be in the message packet that ultimately arrives at the host, but neither one conclusively states whether it is the agent that provides this address.

Given this gap in the record, we are left with the following undisputed facts: (1) Stealth's XTool agent provides a message packet to the host system with at least the agent's IP address; and (2) the packet contains the IP addresses of both the agent and the host when it arrives at the host system. Absolute argues that, based on these facts, the next logical inference is that the XTool agent also provides the host IP address. The district court, however, granted Stealth's motion for summary judgment of non-infringement, finding that "Absolute's arguments and evidence . . . fail to demonstrate that the *XTool agent*, as opposed to any other component of a client device, furnishes, supplies, or makes available any 'global network communication *link*.'" *District Court Decision*, at 671 (emphasis in original).

We find the district court's determination on this point erroneous. The decision fails to draw a reasonable inference in favor of Absolute, the non-moving party, namely that the XTool agent itself provides the host IP address that appears in the message packet. *See Ala. Farm Bureau Mut. Cas. Co. v. Am. Fid. Life Ins. Co.*, 606 F.2d 602, 609 (5th Cir. 1979) (inferences most favorable to the non-moving party must be drawn, and "[s]uch inferences may create disputes regarding basic facts or regarding facts to be inferred from such facts"). On these facts, a reasonable jury could find that the same component that provides the agent IP address and sends the packet—the XTool agent—also provides the host IP address that is in that packet when it arrives at the host. Because the

evidence of record creates a genuine issue of material fact, we vacate the district court's summary judgment of non-infringement of the '758 and '863 Patents.[7]

### 3. Summary judgment of non-infringement of the '914 Patent

Absolute also appeals the district court's grant of summary judgment of non-infringement of the '914 Patent, which was based on its finding that Stealth's XTool Tracker does not meet the "contacting . . . without signaling" limitation found in claim 4, the only independent claim asserted. It is undisputed that Stealth's XTool Tracker agent does not emit an audible signal when it establishes a connection with the host, but that it does emit a "beep" "at the end of the contact with the host."

---

[7]    We also reject Stealth's argument that summary judgment is appropriate even if the agent provides both the agent and host IP addresses. Stealth contends that providing the IP addresses of the two endpoints (i.e., the agent and the host) is insufficient to satisfy this limitation because it would not identify a connection "used to enable data transmission between said electronic device and said host system," as required by the district court's claim construction. Stealth asserts that the construction of this term requires the identification of one of the *intermediate* connections along the route, not just the endpoints. Under the plain reading of the claim construction, however, the connections can be either "direct or indirect" and do not necessarily need to be between two consecutive nodes. This reading is confirmed by the special master's statement in his report: "Note that such a communication link may be identified by giving the IP address of each of the two nodes *at either end* of the communication link, but neither of these IP addresses and neither of those nodes is itself a 'communication link.' . . . The connection between each of these consecutive nodes is a communication link in the Internet, as is the connection between *any other two Internet nodes*." JA 040025-26 (emphases added). Accordingly, this argument is without merit.

Decl. of Pedro Camargo, JA 090011, ¶ 14. Based on these facts, the district court found that "[t]his claim does not read on Stealth's XTool agent because upon the occurrence of *every* communication with the host-monitoring system the agent triggers an audible signal at the end of that communication." *District Court Decision*, at 673 (emphasis in original). On appeal, Absolute argues that there are at least issues of fact as to whether the agent's silence at the beginning of the connection and during communication constitutes "contacting . . . without signaling" as that term has been construed by the district court. As explained below, we agree with Absolute and vacate the district court's grant of summary judgment on this issue.

The district court, in granting judgment of non-infringement, relied heavily on reasoning in the special master's R&R. During claim construction, the parties disputed whether "contacting" meant only the initiation of a communication or actually encompassed the *entire* communication, with Absolute arguing for the former interpretation.[8] Finding that there was no clear definition of "contacting" in the patent, the special master relied on two dictionaries that define the word "contacting" as "to get in touch with; communicate with" and "to communicate with." JA 040044 (citing *American Heritage Dictionary of the English Language* 406 (3d ed. 1996) and *Random House Webster's Unabridged Dictionary* 437 (2d ed. 2001)). He also noted that, "[s]ince there is no clear indication that the patentee intended to limit the use of this word to only the initiation of the communication, I find that the word 'contacting' as used in the patent is not so limited." JA 040044-45. Accordingly, the special

---

[8] The parties did not ask the court to construe this term as a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6.

master recommended construing the term to mean "getting in touch with or communicating with a host monitoring system without signaling (not necessarily through active suppression) the visual or audible user interface." The district court adopted the special master's construction, and neither party challenges the correctness of this claim construction on appeal.

Because the district court believed the special master intended to give "contacting" a broad definition, it rejected Absolute's argument that the Stealth XTool Tracker infringes if it *either* establishes a connection with the host without signaling *or* sends information without signaling. According to the district court, an audible signal at any time before the communication terminates is sufficient to avoid the "without signaling" limitation of the '914 Patent. We disagree with that conclusion for two independent reasons.

First, the district court's claim construction is "getting in touch with *or* communicating with," such that the Stealth agent infringes the '914 Patent if it does either. Here, Stealth's own expert admits that the agent does not emit a sound when it establishes a connection with the host, thereby confirming that Stealth's XTool Tracker meets this limitation. Dep. of Pedro Camargo, 92:19-25, JA 100098. Although the special master may have intended to provide a broad definition for "contacting," the plain terms of the construction do not comport with that intention. In its response to Absolute's appeal, Stealth effectively asks this court to change "or" to "and" in the construction (to read "getting in touch with *and* communicating with"), but Stealth neither sought to clarify this construction before the district court nor challenged it on appeal. Stealth cannot rewrite a claim construction it previously endorsed at this late stage of the proceedings.

Second, even if we agreed with Stealth that the use of the disjunctive "or" in the construction meant only that "getting in touch with" was synonymous with "communicating with," there are issues of material fact as to the temporal relationship between the communication and the audible signal the XTool agent emits. For example, if there is a gap between the communication and the XTool agent's audible signal, a fact-finder might reasonably conclude that the communication is sufficiently removed from the signal that the communication is accomplished "without signaling." Or, as Absolute contends, a reasonable jury might find that, if the communication with the host is complete—i.e., that all information to be conveyed to the host system has been conveyed—before the signal occurs, the signal does not occur during communication, regardless of any meaningful temporal gap between the completion of the communication and the signal. While Stealth argues that the signal always occurs as part of the communication, that is a question of fact to be assessed by the trier of fact. Summary judgment of non-infringement of the '914 Patent, therefore, must be vacated.

## B.   Stealth's Cross-Appeal

Stealth raises three issues on its cross-appeal, arguing that:  (1) the district court's claim construction of the term "semi-random rate" is erroneous; (2) genuine issues of material fact preclude summary judgment of non-infringement of the '269 Patent; and (3) the district court's construction of the terms "unique usage agreement information" and "said terms of said usage agreement imbedded in said software" is erroneous. For the reasons explained below, we conclude that the district court correctly construed all the claim terms Stealth challenges, and we find that summary judgment of non-infringement is proper.

### 1. Construction of "semi-random rate"

The term "semi-random rate" appears in independent claims 12 and 25 of the '269 Patent, which require "transmission means for initiating, at a *semi-random rate*, the transmission of the message packet from the formatting means to the central site means of the system surreptitiously of a user of said electrical apparatus." The parties dispute the degree of randomness required for the message transmission, specifically whether the claim is limited to a random call within a "predetermined time interval," such as once per day, week, or month, as Absolute urged, or whether no such time interval limitation exists, which Stealth argued.

The special master agreed with Absolute, recommending that "semi-random rate" be construed as "normally taking place exactly once at a randomly chosen time during each occurrence of a repeating predetermined time interval." JA 030025-26; JA 020005 (order adopting construction).[9] In reaching this proposed construction, the special master placed significant weight on the fact that the specification refers to an embodiment designed to make one call during a specified time period as the "present invention." Specifically, the relevant text of the '269 Patent describes the randomizer of Figure 2 as having two functions: (1) ensuring that there is "one call per time period, such as day/week/month"; and (2) making sure "that call is made randomly at only one time during that

---

[9] This construction is from the special master's Amendment to the R&R. The special master originally construed the term as "occurring once at a random time within a predetermined time interval," but amended that construction following additional briefing. Both the original and amended construction include the time interval requirement that forms the crux of the claim construction dispute.

period." '269 Patent col.4 ll.30-37. That section states that "[t]he *present invention* is designed to make one, and only one, call during the selected period . . . ." *Id.* (emphasis added). The specification also refers to Figure 1 as "a flow chart of the major functions performed by the *present invention*," and states that Figure 2 is a detailed flow chart of the randomizer portion of Figure 1. *Id.* col.3 ll.8-11 (emphasis added). The description of Figure 1, moreover, describes the preferred embodiment by saying that "[t]he monitoring system of the *present invention* is intended to be secretly included at the time of sale . . . ." *Id.* col.3 ll.42-43 (emphasis added). Accordingly, the special master found that the specification limits the entire invention to placing one call per time interval, a construction the district court adopted.

On appeal, Stealth argues that the district court's construction of the term "semi-random rate" is erroneous because it: (1) improperly imports a limitation from a specific embodiment into a claim based on references to the "present invention"; (2) ignores that the specification expressly refers to predetermined time interval calling as an optional feature; (3) ignores that calls are only "*preferentially* triggered at a carefully controlled semi-random rate, perhaps once a week," '269 Patent col.2 ll.57-59 (emphasis added); and (4) confuses the misuse detection purpose of the invention, to which the "semi-random rate" limitation relates, with the performance-monitoring purpose of the invention. In support of its own proposed construction, Stealth argues that "semi-" simply means "somewhat," such that the intervals must only vary "somewhat randomly," but that there is no predetermined time interval limitation. We do not find Stealth's arguments persuasive.

Although we disagree with the special master's reasoning that the references in the specification to the

"present invention" limit the entire invention to the preferred embodiment, the asserted claims themselves, and the specification relating to those claims, otherwise support the district court's construction that "semi-random rate" includes a time interval limitation.  It is true that, in some circumstances, a patentee's consistent reference to a certain limitation or a preferred embodiment as "this invention" or the "present invention" can serve to limit the scope of the entire invention, particularly where no other intrinsic evidence suggests otherwise.  *See Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention"); *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (noting that, "[o]n at least four occasions, the written description refers to [only one particular component] as 'this invention' or the 'present invention'" and finding that the prosecution history does not support a broader scope).

On the other hand, we have found that use of the phrase "present invention" or "this invention" is not always so limiting, such as where the references to a certain limitation as being the "invention" are not uniform, or where other portions of the intrinsic evidence do not support applying the limitation to the entire patent. *See Voda v. Cordis Corp.*, 536 F.3d 1311, 1320-22 (Fed. Cir. 2008) (although parts of the specification referred to a certain embodiment as the "present invention," the specification did not uniformly refer to the invention as being so limited, and the prosecution history did not reveal such a limitation); *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1326 (Fed. Cir. 2008) (references to a specific embodiment as "the apparatus of this invention" and "a useful feature of this invention" in the specification "are contradicted by

a number of express statements in the '609 specification clearly indicating that [the feature at issue] is a feature only of certain embodiments"); *Rambus, Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1094-95 (Fed. Cir. 2003) (although portions of the written description referred to the term at issue as limiting the claimed invention to a preferred embodiment, "the remainder of the specification and the prosecution history shows that Rambus did not clearly disclaim or disavow such claim scope in this case").

In this case, the '269 Patent is more like the patents at issue in *Voda*, *Praxair*, and *Rambus*, in that the specification does not uniformly refer to a one-call-per-time-period limitation as being co-extensive with the entire invention. Significantly, under the Description of Operation section, the specification of the '269 Patent states that:

> Some of the features that *can* be included in the *present invention* to make [a work around] more difficult are:
>
>     \*    \*    \*    \*
>
> 2) Schedule the transmissions to occur randomly – the monitored apparatus shouldn't phone home every Monday at 8 A.M.
>
>     \*    \*    \*    \*
>
> 4) Program the Remote Site monitored apparatus *to place exactly one call per time period, i.e. day, week, or month.* Thus, if the Central Site observes multiple calls from the same software serial number in the same time period, then it can be certain that that copy of the software has been installed on more than one system in the field.

'269 Patent col.6 ll.30-60 (emphases added).

This portion of the specification expressly describes the features of a predetermined time interval and a random call during that interval as two *optional* features of the "present invention." Because the specification uses "present invention" in a way that expressly contradicts earlier references to "present invention" as requiring both one call during a time interval and the randomness of that call, we do not agree that the invention is so limited.

Our conclusion does not change the district court's construction, however, because the claim language and the specification otherwise support that construction. Notably, the language of claim 27, which depends from independent claim 25, strongly suggests that the term "semi-random" includes a time interval component. Claim 25 recites a method including the steps of sending messages to the host "at a semi-random rate." Dependent claim 27 recites the method of claim 25, with the further step of "identifying if more than one remote monitoring means transmits the same unique identification to the central monitoring means *within the same selected time period* as another." '269 Patent col.11 ll.60-63. Here, the "same selected time period" refers to the period in which messages are sent to the host, which is the "semi-random rate" of claim 25. This claim language, therefore, commends the interpretation that "semi-random rate," as used in these claims, refers to calls within a particular time period.

The specification further supports a time interval limitation. The term "semi-random rate" appears only in the Abstract and in the Summary of the Invention, both times referring specifically to a time interval of "once per week." '269 Patent Abstract ("The call limitation is preferentially triggered at a carefully controlled semi-random

rate, perhaps once a week."); *id.* col.2 ll.57-59 (same). There are also repeated references in the specification to the placement of one call per time period. *E.g.*, '269 Patent col.4 ll.30-37 ("[T]o insure that one call per time period, such as day/week/month, is made to the Central Site."); *id.* col.4 ll.48-50 ("Thus the triggering time is uniformly randomly distributed over the selected time interval, say one month."); *id.* col.6 ll.54-56 ("Program the Remote Site monitored apparatus to place exactly one call per time period, i.e., day, week, or month."). These references provide strong support for the district court's construction that the term "semi-random rate" includes a one-call-per-time-interval aspect.

Given that the '269 Patent describes the time interval limitation as an optional or preferred feature, Stealth argues that construing "semi-random rate" as requiring such a limitation is erroneous because it improperly imports a limitation from the preferred embodiment to the entire patent. For the reasons explained above, we agree that this time interval limitation does not apply to the *entire* invention solely because of references to the "present invention," but that limitation does apply to the "semi-random rate" term as used in the asserted claims.

We are also not persuaded by Stealth's argument that it is error to apply the time interval limitation to the term "semi-random rate" because it confuses the misuse detection purpose of the invention (i.e., determining whether a product is being used beyond the scope of the license) with the performance monitoring purpose of the invention (i.e., determining whether the product is functioning properly). According to Stealth, claims 12 and 25—the claims at issue that include the term "semi-random rate"—relate only to performance monitoring. In contrast, claims 11 and 29 relate to misuse detection and do not include the term "semi-random rate." Stealth asserts that, for pur-

poses of monitoring performance, there is no reason why calls must occur only once within a given interval.

Stealth's argument is not supported by the record. Claims 5, 21, 27, and 28 include the "semi-random rate" limitation and are directed to detecting software misuse in addition to monitoring performance. Dependant claim 28, for example, incorporates claim 25's "semi-random rate" limitation and recites the step of determining whether a device is "using an illegal copy" of another proper device. '269 Patent col.12 ll.1-4. This claim, therefore, uses the "semi-random rate" limitation in the context of detecting misuse based on multiple transmissions of the same unique identification "within the same selected time period." Accordingly, the district court did not err in applying a time interval limitation to those claims that include the "semi-random rate" limitation.

Finally, Stealth's position is problematic because its proposed construction of "semi-random" simply as "somewhat random" finds no support in the claims or the specification, and provides no guidance as to the parameters of that term. For these reasons, and in light of the claim language and portions of the specification identified above, we agree with the district court's construction of "semi-random rate."

## 2.    Summary judgment of non-infringement of the '269 Patent

Stealth contends that, even if we agree with the district court's construction of "semi-random rate," there are genuine issues of material fact as to whether Absolute's product makes calls at a semi-random rate, that is, "exactly once at a randomly chosen time during each occurrence of a repeating predetermined time interval." JA 020005. Stealth asserts that there is sufficient evidence of infringement both literally and under the doctrine of

equivalents. We disagree, and therefore affirm the district court's judgment of non-infringement on these grounds.

### a) Literal infringement

As it relates to literal infringement, the district court found that Absolute's products did not perform the function of initiating a transmission at a semi-random rate because of the undisputed evidence that Absolute's products are designed to initiate a call to the monitoring center 24.5 hours following the completion of the last call. On appeal, Stealth admits that this fact is undisputed. Stealth's Reply Br. 10-11 ("As Absolute pointed out, the material facts on this issue are generally undisputed. Absolute's products are designed to initiate a call to the monitoring center 24.5 hours following the completion of the previous call . . . ."). Stealth argues that Absolute's product infringes, however, because its call times vary based on the variances in the end-times of each call session. To support its argument, Stealth points to a variety of factors that may cause the length of call times to vary, including whether Absolute is experiencing a significant load on its system or because of lack of Internet availability. According to Stealth, the interval between calls made by Absolute's product can become so varied as to become "random" as that term is construed.

Stealth's arguments are without merit. Although the exact timing of future calls made by Absolute's product cannot be predicted with certainty, the fact remains that, when a call finishes, the next call will be initiated exactly 24.5 hours later. As the district court correctly found, the '269 Patent's *randomness* requirement is not satisfied by mere *unpredictability*. *See District Court Decision*, at 666-67. For example, "when calls are made [by Absolute's product] on consecutive days, the second call will always

be at a later time in the day than the first call," such that the calls are not "uniformly randomly distributed over the selected time interval." *Id.* In Absolute's product, the time of the next call will always occur exactly 24.5 hours after the end of the last call. Stealth's reliance on unusual circumstances such as lack of Internet availability to demonstrate a variety of call times does not make Absolute's calls random within the meaning of the '269 Patent, which requires only that the call "normally" take place once during a time interval. Ultimately, the relevant claims of the '269 Patent require that the transmissions occur "at a randomly chosen time," and exactly 24.5 hours from the last call does not meet that limitation as a matter of law.

### b) Infringement under the doctrine of equivalents

Stealth also challenges the district court's finding that Absolute's products did not infringe under the doctrine of equivalents. "Infringement under the doctrine of equivalents requires that the accused product contain each limitation of the claim or its equivalent." *AquaTex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1382 (Fed. Cir. 2005) (citing *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997)). An element of an accused product is equivalent to a claim limitation if the differences between the two are insubstantial, a question that turns on whether the element of the accused product "performs substantially the same function in substantially the same way to obtain the same result" as the claim limitation. *Id.* (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950)).

Two of the functions of Stealth's "semi-random rate" limitation are to detect piracy of software on the devices on which its software is installed and prevent users from

detecting when the agent will make the next call to the central site. In contrast, the 24.5 hour interval built into Absolute's products is designed to reduce the load on its servers so that the devices on which its software is installed are not all scheduled to call in at the same time, a fact that Stealth concedes. Stealth, however, also argues that Absolute touts the secrecy and undetectability of its product in marketing materials. As the district court correctly found, there is no evidence that the statements Stealth cites are related to call timing as opposed to other features, such as contacting the host without alerting the user by signaling the audible or visual interface. Indeed, a user of Absolute's products can determine precisely when the software will next contact the host center because it occurs 24.5 hours after the last communication, which is not a feature conducive to preventing users from predicting and preventing the next call. Accordingly, the district court correctly found that Absolute's products also do not infringe under the doctrine of equivalents.

### 3.   Construction of "unique usage information agreement" and "terms of said usage agreement imbedded in said software"

Finally, Stealth challenges the construction of the terms "unique usage information agreement" and "terms of said usage agreement imbedded in said software," which appear in claims 11 and 29 of the '269 Patent. According to Stealth, Absolute would infringe under a proper construction of these terms because its software sends an identifying serial number to the host, but it does not challenge the finding of non-infringement based on the current construction.

The district court construed the limitation "unique usage agreement information" as "information describing the unique usage agreement for this copy of the software,

including a statement of the terms of that usage agreement." In arriving at this proposed construction, the special master found that the words "said terms" in step c. of claim 11 inform the meaning of "information" in step a.—i.e., the word "terms" refers to the type of the "information" required. The district court construed "terms of said usage agreement imbedded in said software" as "parameters detailing what is granted by the license agreement for the software, such as the duration or expiration date, number of authorized installation/seats, number of authorized users, or restrictions relating to backup copies of the software." Importantly for this appeal, that construction requires that the terms include more than just a serial number or other identifying information for a license agreement. It is undisputed that Absolute's Computrace product transmits an electronic serial number to the host monitoring center but does not transmit the actual terms of the licensing or usage agreement itself. As a result, its product does not infringe Stealth's '269 Patent under the district court's construction.

Stealth argues that the district court's construction of "unique usage agreement information" is inconsistent with the preferred embodiment, which refers to the apparatus sending "the serial number of the apparatus or the software it is running" to the monitoring means. '269 Patent col.3 ll.54-55. The embodiment indicates, however, that this is just one piece of information the apparatus is programmed to send, and it does not exclude the possibility that it also sends the terms of the usage agreement. *Id.* ("That information would include, *for example*, the serial number . . . .") (emphasis added)). Thus, the district court's construction is not inconsistent with the preferred embodiment.

Stealth also cites the Description of Operation of the '269 Patent, which states that "[b]y imbedding a unique serial number in the software shipped with each system, it becomes possible to track the current whereabouts of each copy of the software that has been shipped." '269 Patent col.6 ll.17-21. Again, this does not mean that the serial number is the *only* information imbedded in the software, and it leaves open the possibility that the terms are also imbedded.

Finally, Stealth faults the special master for not taking into account the word "said" in "said terms of said usage agreement." According to Stealth, "said" refers back to "unique usage agreement information," which it contends means "serial number." Stealth's argument fails, however, because the special master did, in fact, take into account the word "said" when he found that "said terms" informed the meaning of "information," such that "information" includes more than only a serial number. We find no error in that interpretation, especially because Stealth's proposed construction would render the word "terms" meaningless. *See Cat Tech LLC v. Tube-Master, Inc.*, 528 F.3d 871, 885 (Fed. Cir. 2008) (refusing to adopt a claim construction that would render a claim limitation meaningless). We, therefore, agree with the district court's construction of this claim term.

CONCLUSION

For the foregoing reasons, we

(1) affirm the district court's construction of "one or more of the global network communication links used to enable transmission between said electronic device and said host system";

(2) vacate the district court's grant of summary judgment of non-infringement by Stealth of the

'758 and the '863 Patents;

(3) vacate the district court's grant of summary judgment of non-infringement by Stealth of the '914 Patent;

(4) affirm the district court's construction of "semi-random rate";

(5) affirm the district court's grant of summary judgment of non-infringement of the '269 Patent; and

(6) affirm the district court's construction of "unique usage information agreement" and "terms of said usage agreement imbedded in said software."

This case is remanded for further proceedings consistent with this opinion.

**AFFIRMED-IN-PART, VACATED-IN-PART, and REMANDED**

COSTS

Each party shall bear its own costs.